

*Forensic Evaluation Face Sheet*

*Name:*  Serena Faye Connelly

*Date of Birth:*  12.2.98

*Date(s) of Offense:*  1.30.21

*Charge(s):*  Title 21 U.S.C. 952 & 960: Importation of a Controlled Substance

*Date(s) of Evaluation:*  25 & 26 September 2021

*Date of Report:*  28 September 2021

*Psychodiagnosis:*  Major Depressive Disorder, Recurrent, Moderate

Other Specified Personality Disorder (Masochistic), with Dependent Personality Traits

Alcohol Use Disorder, Moderate

Cannabis Use Disorder, Mild

Sources of Information

| Date | |
|---|---|
| 1.13.21 | Department of Homeland Security – Memorandum |
| 1.30.21 | Department of Homeland Security – Incident Report |
| 1.30.21 | Department of Homeland Security – Other Officer Report |
| 1.31.21 | Department of Homeland Security – Incident Report |

*Methods of Appraisal:*

1. Clinical Interview
2. Life History Questionnaire
3. Collateral Review of Records
4. Motivations for Offense Self-Report
5. Millon Clinical Multiaxial Inventory-III (MCMI-III)
6. Level of Service/Case Management Inventory (LS/CMI)

7.   Psychopathy Checklist-Revised Second Edition (PCL-R 2nd Ed.)

***Risk of Recidivism[1]:***

        Risk of Recidivism:       Low

***Recommendations to Manage Risk:***
1.   Formal Supervision
2.   Individual Psychotherapy
3.   Urine Drug Screen Testing
4.   12-Step Meeting Attendance
5.   Psychiatric Evaluation & Monitoring


***Demographic Information***

This 22-year-old, single, partly college educated Caucasian female was forensically evaluated on the dates above at the offices of Intrapsychic, in San Diego, California.


***Informed Consent***

The purpose and limitations of this evaluation were explained to Ms. Connelly.  I described the nature of the referral and scope of my work:  Her attorney requested from me a psychological evaluation as a means of assessing her psychological functioning and recidivism potential. She was informed that her attorney could submit my work to the Court, and that there existed the possibility of my testimony in her case.  She was informed that the entirety of our discussions, and test results, would not be confidential, and that I might include any finding in the body of my report.  She was told that were she to reveal to me any history of sexual behavior with minors, incidents of child or elder abuse, or information indicating she was a danger to herself or other people, these would be reported, as mandated by law.

Ms. Connelly understood the purpose of my work and the limitations of confidentiality.  She agreed to participate in the evaluation and signed a statement of informed consent stipulating this.


***Offense Information***

    <u>Official Record</u>

The instant offense in this case involves Ms. Connelly's actions in January of 2021, at a time she was living in a rented apartment in San Diego, working on a full-time basis as a professional welder, utterly riven by guilt, self-

---

[1] Very Low, Low, Medium, High, Very High

blame and self-loathing attendant to the end of a romantic relationship, and free of the influence of intoxicating substances, by her report[2].

Collateral information indicates the following, in regard to the instant offense:

- *On January 30, 2021, at approximately 11:30 PM, Serena Connelly… applied for entry into the United States from Mexico through the San Ysidro Port of Entry in vehicle lane #23. [She] was the driver, sole occupant, and registered owner of a 2007 Chevrolet Uplander…bearing California license plates.*

- *A Canine Enforcement Team was conducting pre-primary operations when the human and narcotic detection dog alerted to the undercarriage area of the vehicle. A Customs and Border Protection Officer…received two negative declarations and sent the vehicle through the Z-portal X-ray machine where a CBPO operator detected anomalies in the gas tank and rear quarter panels of the vehicle. Further inspection of the vehicle resulted in the discovery of 68 packages concealed in a compartment below the center console area, with a total approximate weight of… 71.34 lbs. A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.*

- *During a post-Miranda interview, Connelly admitted the purpose of her visit to Mexico was to make $5000 USD. When asked, [she] said that 'for $5000 something illegal was happening but assumed that was 'already taken care of' before having her vehicle returned to her by unknown individuals that had 'borrowed' it.*

<u>Defendant's Version of Events</u>

Ms. Connelly's reports of the events in question are obtained from two sources: her written and verbal responses to questions posed during this evaluation. Together, they are characterized by an admission of guilt, statements of remorse, a denial of knowledge in regard to the specific elements of what was to occur, an entirely masochistic approach to the demands of her life, generally and with regard to the instant offense. The central concern in this case, as we will see, is a masochistic character structure, inside of which Ms. Connelly was unable to place a boundary between herself and poor treatment from others; allowed herself to be demeaned and exploited; blamed herself for the behavior of an abusive romantic partner; and ultimately, perhaps as a means of demonstrating to herself her own worthlessness, agreed to participate in a criminal enterprise, which resulted in her arrest and likely incarceration. Psychoanalytically defined, masochism is the felt sense that one is *justified in one's suffering.* This case is a textbook example[3].

---

[2] On the day in question; Ms. Connelly reports intense use of both alcohol and marijuana around the time of the instant offense; she was, however, sober on the day in question.
[3] See McWilliams, N. (2011). *Psychoanalytic Diagnosis: Understanding Personality Structure in the Clinical Process (2nd ed.).* Guilford Press.

<u>Written Responses to Evaluation Questions</u>

o  [In response to a question asking the defendant for her statement as to the cause of her referral for evaluation]: *In January, I agreed to a 'job' that caused me to unknowingly bring drugs across the border of Mexico to the USA, and was caught at the border. Though I unknowingly brought drugs across, there were pointed signs or red flags that I had ignored, and I did not realize how illegal the events I was participating in were.*

o  [In response to a question asking defendant for her thoughts on the 'most important factor or factors' leading to her actions]: *The factors that led to agreeing to my part of job was (sic) depression because of a break-up, abandonment for being alone, misguided judgment from weed intake.*

o  [In response to a question asking Ms. Connelly for her thoughts before, during and after the incident:

   ▪  Before: *I did not have reason to think and did not care what I was doing.*
   ▪  During: *I did not question anything, and trusted the people I was with.*
   ▪  After:  *I was terrified for my life and concerned about my family.*

o  [In response to a question asking the defendant for her thoughts as to how she 'convinced' herself to engage in the acts in question]: *I trusted the guy who offered the job, and thought of him as a good person. I had no reason to think I was in harm's way.*

o  [In response to a question asking Ms. Connelly to add anything else she might think of import]: *I thought very little of myself, as worthless. But I love everyone. I was covering my pain with weed and alcohol and sex with random people I just met. I trusted everyone.*

o  [In response to a question asking the defendant for her feelings as to the crime she has committed]: *I am extremely sorrowful. I wish I could go back and say no. I never wanted to be or will want to be outside the law. I believe I sinned against God and am worried about my soul's judgment. I feel I cannot forgive myself for causing my family so much pain.*

During the interview, the defendant stated:

•  *It was a co-worker that offered. He said, 'I can get you a job that makes you a lot of money.' He said it was very easy. All I had to do is drive to Tijuana and let one of his guys borrow my car. Then, they'll give it back, and I'll drive back home. I said, 'okay.' He had the guy call me. When I talked to him, he said, 'it'll be fine.' I went there, and he just took me to a hotel, and took my car for a few hours, and picked me back up, and said I'm good to go, and I can go home.*

- [What did you think was going on?]: *I didn't think about it. Honestly. I didn't ask questions. There was a lot of red flags. And this is something that has been made extremely obvious to me, from my lawyer and the prosecutor. I completely ignored all of them. I don't know if I purposely ignored them. I kind of feel that I did. I was very numb at the time. Thinking wasn't what I did on a regular basis. I was used to blanking out, and going with the flow. I couldn't really understand the guy I met up with.*

- [You must have thought something]: *I didn't think I was doing anything illegal.* [What did you think he was going to do?]: *I didn't really care what he was gonna do. If they were doing something illegal, I didn't feel like I was a part of it. I didn't understand that giving your car to someone for them to do something illegal was illegal. I didn't understand that, either. So, the honest truth is – I wasn't thinking about it. I completely ignored everything. I was very compliant with them. They asked me to do something, I did it.* [It never occurred to you that they would put drugs in the car?]: *It didn't no.*

- [Are you angry at your friend?]: *I've never felt very angry[4]. Which is also something I've been questioned about. But, I'm more just angry or disappointed with myself than with him[5].* [Because]: *There was obvious things. And I should've been paying attention. And automatically known. Or, at least given it some kind of thought. That what was happening was not lawful, and it wasn't good.*

- [For how long had you known your co-worker?]: *He was already on the crew. I think I met him late October, early November. I didn't know him extremely well. I just had a common relationship; with any co-worker I was friendly and I kind of 'want to get to know you' a little bit. Anybody I worked with, I trusted. I don't know.*

- [You didn't know any of the men in Tijuana?]: *No, none of them. I just knew they knew my co-worker, and that was fine. He said, 'they're going to take care of you,' and that was fine. I was okay with that.*

- [In response to a question as to whether Ms. Connelly wanted to add anything else to her report]: *There was a threat my co-worker said to me beforehand. He did say, like, 'if anybody asked anything about this, keep my name quiet because otherwise I'm going to come kill you myself.' I thought he was joking. I thought he was being sarcastic. I didn't understand how serious everything was. Until I was asked by Border Patrol to turn off my car. That's when I understood, really, what was happening.* [Is that why you failed to give his name?]: *Yes. I was terrified. In that moment I was arrested, everything became extremely overwhelming. I think about that threat, and think, 'maybe that was real.' Instead of sarcastic.*

---

[4] The defendant is referring here to her adult male co-worker; she is unable to stir up any righteous indignation (if we accept her version of things) because she is already, in her own mind, the wholly guilty party. The 'kryptonite' to masochism – the key to its end – lies in the subject's ability to summon 'healthy aggression,' inclusive of anger. The masochist cannot do this due to that he or she is already 'the worst of the worst.' The neurotic conflict, put another way, is 'guilt over aggression.'
[5] A sentiment she also feels in regard to the end of her romantic relationship. She is *bad*, and responsible.

- [Do you feel as if you are justified in your suffering?]: *Uh, yeah. Well, I feel like, obviously, what I did was illegal. And so, clearly, this whole process is a part of that. And I'm guilty. So, that makes sense to me. And I also feel like this is not something that God would've wanted me to do. And I feel like I've failed him. I've been disobedient to him. Then, whatever happens to me at this point – I don't know if these are the right words – but it's kind of a punishment for sin.* [You'll deserve what you get]: *Yes.*

### Reason for Referral

Ms. Connelly was referred to my office by her attorney, Russell Babcock, Esq.   The current evaluation is inclusive of all of the instruments listed in the above, psychodiagnosis, risk appraisal, levels of risk, a motivational understanding of the defendant's behavior in the instant matter and prior to it, and recommendations to manage this risk in the community.

### Psychosocial History

#### Current Circumstances

Serena Connelly is a 22-year old, newly single Caucasian female, residing at present in a rented apartment in San Diego, awaiting the resolution of the criminal charges that have been filed against her. Ms. Connelly denied developmental irregularities in her childhood, denied that her mother used intoxicants during her gestation, and denied any history of head injury or loss of consciousness, over her lifecourse.

#### Family History

A timeline: The defendant was born in Valdosta, Georgia and raised for the first eight years of her life in nearby Hahira, population less than 2000. The family (mother, father, defendant and siblings) moved, when she was age eight, to Hillsborough, North Carolina, due to her father's work transfer. They remained in Hillsborough for five years and then decamped for Johnston, Iowa, attendant to another transfer, where they remained for another five years. Next came Homer Glen, Illinois, for a half-decade, followed by Port Orchard, Washington, for one year, a move Ms. Connelly made on her own, 'because [she] was dating someone [she] was in love with.' In September of 2020 the defendant made her final move, to the South Bay area of San Diego, so as to be near her United States Navy-enlisted boyfriend.

Joanne Connelly, the defendant's mother, a homemaker, was described in the following way by her daughter:

- *She's like one of the most loving people that I've ever met. She wants to help everybody, though I do think she's somewhat depressed. And she is very emotional.* [What makes you say that?]: *Um. She gets into, like, these depression dumps sometimes. Her emotions – she's great to talk to, and she gets very invested in whatever it is she's talking about. She's a very deep person. But she feels everything.* [You love her]: *Yes. Very much.* [What would you say if you were asked to say something negative?]: *It would just be that she*

6

> *is, um, definitely too emotional. And sometimes she is – what do you call it – not manipulative, but…kind of like a helicopter mom.*

The defendant remembers hallmarks of warm affection from Mother, in the form of hugs, kisses and 'I love yous', and denied the existence of substance-related difficulties, any arrest history, or mental health issues in Joanne.  I asked Ms. Connelly if the family, including Mother, was religious:

- *Yes. It's non-denominational. We're Christian, and it's a very small, like, Christian community. We have, like, very puritan values, and we just meet in homes, and share the Bible together. We don't really have a name, because it's not about that. It's just about following Jesus.*

Michael Connelly, a regulator in the agriculture business, was described in similarly positive terms:

- *He's very friendly. Very logical. He's also extra-loving. A very deep person. He likes to try new things. And nothing is – well, he likes to be very physically active.* [Something negative?]: *It would probably be not much (laughs). Dad's pretty great. I guess his only flaw would probably be – he gets bored if he doesn't do anything. Doesn't like to sit around. But, like, with trying to help me out, he likes to: 'let's talk through things,' and I don't want to talk. He just wants to solve.*

Ms. Connelly told me of expressions of affection from her father, though also noted that his bedside manner 'is not so delicate.' He drinks alcohol only socially, does not use other substances, has never been arrested, and has no issues, to his daughter's knowledge, associated with his mental health. I asked at this if she believes that her behavior has disappointed her parents:

- *Well, they didn't raise me like this. There was no drugs or alcohol even really mentioned in our house. And they never wanted me to move so far away. And, I mean, this is just not what they would've envisioned for any of their children. They're being very supportive.*

The defendant told me, in something of a surprise, of a history of bickering between her parents. In their community, she continued, divorce is 'just not highly encouraged.' She told me that for the most part she has identified with her father during these arguments, as she has viewed him as the more logical one.

The family is comprised of an older brother and sister, and two younger sisters, all of whom live in the Midwest, none of whom (apart from a brother diagnosed with an Autism-spectrum Disorder), struggle with mental health or substance-related issues. None have been arrested, and Ms. Connelly spoke highly of her home life as a child:

- *We are very supportive. I describe it as if somebody had something going on, like a game or sport or fine arts thing, it was not they had it – it's we had something going on. We're always there for each other. An open family. Everyone was invited to our house. If I wanted to hang out with a friend, mom typically said, 'you can invite them here.'*

7

Ms. Connelly was spanked upon transgressions in her early childhood, and then would suffer a loss of privileges. She denied that she was ever removed from the home, that Child Welfare Services was involved in her life as a juvenile, that she was ever diagnosed with a disorder of inattention or impulsivity, and that she was ever placed on any medication by which to improve or regulate her mood. I asked her what kind of 'mischief' she might have gotten into as a child: *Not much.* Smoking weed? *No. Never.* Drinking? *No.* Tagging? *What's that?* You rarely got in trouble, I take it. *Yeah. Yeah, rarely.*

*Educational & Social History*

Ms. Connelly attended elementary school in Georgia and North Carolina, middle school in North Carolina and Iowa, and high school in Iowa and Illinois. I asked for her thoughts as to how moving her place of residence might have affected her development:

- *It made me really okay with more shallow relationships. Because people were extremely friendly. They were never people who I would continue a friendship with. Once you move, they just don't… It is in the past.*

She told me of several long-time friends, however, including the daughter of her parent's friend and 'just other people' from church. I asked of her peer group in school:

- *I didn't really have an exact clique. I tried to get along with everyone. I was definitely someone who was viewed as very nice. I'm not very judgmental of people, so that helps, I guess – people kind of like me. I was in a lot of the fine arts. So, we had choir and drama. But I was also into agriculture. Those kids were my friends, and some of my best friends were the extra smart people. So, I also kind of dabbled in some of that.* [Were you considered a loner?]: *No. I just kind of took the shallow relationships at face value, and that was fine.* [How would your teachers have described you?]: *Very polite. I did my work. I got good grades, which teachers like.* [Something negative?]: *Maybe just kind of just throwing it out there, but possibly that I didn't really – not that I didn't care, but maybe it was obvious that I wasn't invested in what I was doing. I don't believe in that system of teaching. I feel it puts a lot of people back, and doesn't encourage anyone to be better.*

I asked Ms. Connelly of her relations with the opposite sex during school. Her answer was an interesting one:

- *I would say that I'm a flirt. I really find men easy to please. Doesn't take a whole lot. Guys are really simple. And don't like complicated stuff. If you just are easy, they kind of like you. If you just smile, and talk to them, then they'll open up, and say, 'oh, cool, I can talk now.'*

She told me of three boyfriends throughout her high school years, and noted that she viewed these as 'very serious,' by which she meant that she agreed to date only because she thought 'there was a possibility of marriage.' Ms. Connelly never failed a grade, was never diagnosed with a Learning Disability, was never suspended, and was never

truant from school (*I always wanted to but that wasn't allowed in our household).* She completed her education by obtaining an Associate's Degree, in welding, from Joliet Junior College.

### Social Deviance, Criminal History & Performance Under Supervision

The instant offense marks the defendant's first interaction with the criminal justice system in her adulthood[6]. She additionally denied arrests or police interaction as a juvenile, and has not, obviously, been supervised in the community prior to the current case.

It is fairly simple for me to state, as we will soon see, that the defendant is neither generally criminally oriented nor psychopathic.

### Psychiatric History

I asked Ms. Connelly, as I do of all evaluation subjects, if things had ever gotten so bad for her as to cause suicidal thoughts. She affirmed this, by stating:

- *There was at one point, but I didn't do anything. That was when I was living in Washington. And my boyfriend and I were just very unhappy with each other. I was very happy with him, but he was just very unhappy in general.* [What did he think?]: *That I was the entire issue.* [That caused you to consider suicide?]: *It did, yeah.* [How did he respond?]: *He got mad.*

The defendant told me she was familiar with felt depression, and then expanded upon things, in a manner that conjured masochistic defenses, and echoed the computer-generated narrative report from MCMI (personality assessment) findings. She told me:

- *I wouldn't call it depressed – I wasn't very sad. But I did feel like everything was my fault. Anything wrong that happened was because of me. And I was often blamed for it.* [By?]: *My boyfriend at the time. But then, like now, I just didn't want to wake up in the morning.* [Have you prayed for death?]: *Yes.*

Ms. Connelly told me that upon her arrival to San Diego, in October of 2020, her boyfriend summarily ended the relationship. Put simply, this devastated her, and hearkened an intrapsychic storm, which nearly drove her to suicide, and from which she has not yet recovered. She told me:

- *It was pretty terrible. Once I got down here, the guy who I was with broke up with me. And that affected me a lot. I don't think very highly of myself. I had zero self-esteem. I got into a lot of stuff, like smoking marijuana and drinking a lot. And hanging out with whoever wanted to. Whether or not I knew them. That was just to cover a lot of pain. If anybody asked me how I was doing, it was always, 'fine.'*

---

[6] By her report and the report of her attorney. If this is not the case then findings herein would be subject to revision.

I asked her if she believed herself to have been overly dependent on affirmations from her romantic partner; she agreed with this, and told me as well that she had 'never felt worth anything.' I asked of the cause:

- *I think it's really because I've lived in such a, like, sheltered community. When I moved out, I missed that. And I needed that. And he was my only home. Because I moved to a brand-new state, I didn't know anybody. When I moved to Washington, I had him. He, at that point, was everything that I had. I do think I leaned on that. Very much.*

The defendant affirmed similar bouts of intense sadness upon the dissolution of a previous romantic relationship, and I commented that the pattern seemed to be one of dependence on romantic partners and then devastation upon the loss of the relationship. '*Yeah, yeah,*' she said. She also agreed with me in regard to the existence of a very self-denigrating inner voice during these times, from which she could not escape. At this, I read her the following excerpt from MCMI interpretive report:

- *Dependency strivings push her to be overly compliant, to be self-sacrificing, to downplay her personal strengths and attributes, and to place herself in inferior or demeaning positions.*

and then asked for her thoughts:

- *Um, it sounds very true. Um. Well. Um. I do believe in self-sacrifice; I do believe in helping other people. I don't think that's demeaning at all. But I agree with it when it says dependency. I do agree with that. I do lean heavily upon others. I lean heavily upon approval; not approval, but I do like it that people are comfortable around me, and maybe they feel good about themselves because I'm around. I go along with a lot of what other people want to do. It's also that it's not that big of a deal to me[7].*

I asked Ms. Connelly if she believes that she has accepted 'poor treatment' from romantic partners:

- *When I was in [the relationship] I didn't recognize poor treatment. Because there was also a lot of good things about him. He was overly nice a lot of times. But I did accept poor treatment. But also, I believe in trying to practice unconditional love. 'If this is who you are, but I've chosen to love you, that's okay.' You can't hate things about people that you love. If you truly love them. I think I just took a lot of blows from trying to tell myself this is kind of the way he is, and I can deal with this.*

I asked if she felt exploited by her partner[8]:

- *I don't.* [Taken advantage of?]: *I don't really feel that bad, no. I don't think he – even though I was told often – that he wasn't feeling great because of me, I don't really think that's true. He possibly could've felt bad, but only because he recognized that he wasn't giving back so much. And possibly, he didn't feel*

---

[7] Hints of masochism come to the surface here.
[8] As we will see, her partner was verbally, physically and sexually abusive, and, even today, she accepts this state of affairs.

*worthy of that, and just turned it into anger, but against me.* [Would you agree that you are submissive and cooperative?]: *That's true. I do try to cooperate with people.*

At this I asked a question at the core of masochism, which was whether Ms. Connelly felt that she 'deserved to suffer.' In her answer, we see the existence of unrelenting standards, the felt sense of not living up to these, then guilt, then a tolerance – even perhaps a wish – for pain, as a means of expiating sin:

- *Not that I deserve to suffer, but more that I don't really deserve that much good. I don't feel like – I feel like I failed a lot. And that is just not worthy of so much good. I feel like I could help a lot more people than I do. I do think [that] I think about myself too much. Especially when I'm sad, or feel kind of numb. I don't give much thought to others.*

The defendant, as I have noted, has never utilized medications as a means of decreasing her pain; she has never, until very recently, engaged in a course of psychotherapy. She did so as late as last week (beginning Monday 13 September); she very much enjoyed a first session, and did not like the second, in telling me that the counselor, a Christian, appeared to be very 'disconnected' during the second meeting, which caused her to cry, hopelessly, in the aftermath[9].

More will be said about intrapsychic dynamics in below sections. Suffice to state now that the evidence at hand would indicate that Ms. Connelly has suffered remotely and acutely from self-criticism and difficulty fashioning an identity for herself. Within the context of a romantic relationship these substrates become 'heated up,' to the point of desperation and pleas for death; she continues, incredibly, to blame herself for a recent breakup, and minimizes (as we will see) execrable treatment of her as something that she should have tolerated, or overcome.

### Medical History

In response to a question as to her physical health, Ms. Connelly stated: *'I would say [its] good.'* She denied the existence of any serious illness over her lifecourse, denied Emergency Room admissions[10], denied any history of head injury or loss of consciousness, and told me, only, of the use of oral contraceptives, as a means of birth control.

### Occupational History

The defendant worked as a babysitter upon graduating from high school, and as a sandwich maker (at the restaurant Jimmy John's) and front desk associate (at L.A. Fitness) during her years in junior college. Upon graduating and moving to the state of Washington, she obtained employment at QED Systems, working as a welder at a shipyard. In October of 2020 she procured a transfer to San Diego, and worked in the same position, for the same company (often at a U.S. Navy shipyard). She acknowledged to me that welding was an 'extremely' male-dominated

---

[9] One wonders whether Ms. Connelly's hopes for herself were piqued during the first session, and whether this caused a sense of fear (of hopes being dashed). During the second meeting, she may have 'shot an arrow' through the heart of psychotherapy, by convincing herself of the counselor's worthlessness. It is better to be in control of one's misery than to suffer it by random events.
[10] Apart from one instance of menstrual cramps, at age 16.

profession, and denied upon a question that she chose it specifically for this reason. I asked how her superiors might describe her:

- *I think they have a good opinion of me. When I left, they had a little good-bye party for me. Down here, my boss is a very straightforward and quiet man. I never know what he's thinking.* [Has it been hard to be accepted by men?]: *No. Actually, they're very helpful. I typically view it as it's not annoying unless I think about it too hard. It's kind of like, 'she needs help.' Anybody will step in and help me with something, or whatever.*

Ms. Connelly described her relations with peers positively, but told me that although San Diego is a 'fantastic' city, and the citizenry 'so friendly,' she is desirous of leaving. 'I think I need to be close to my family,' she stated.

*Substance Abuse History*

According to her report Ms. Connelly, although not a teetotaler, used alcohol and marijuana very sparingly prior to October of last year. Subsequent to that date, amidst grief and self-recrimination, she seems to have 'given up,' and her use increased dramatically.

In regard to marijuana use: The defendant smoked 'maybe once or twice' prior to arriving in San Diego, with her boyfriend 'and his friends at the time.' Dating from October, however (until her induction into United States Federal Pretrial Services), she smoked 'five out of seven days,' and denied guilt associated with this: 'it didn't cause me to feel much at all,' she stated, 'which was kind of the point.' She continued, and linked her use of the drug to felt grief:

- *It just makes me happy in a sense that I don't feel any pain. Any loss. And then, I mean, it's very calming.* [Soothing]: *Yeah.*

She told me, finally, that she is glad not to be smoking at present, and reported a desire to desist from use, permanently (*'I don't really wanna ever smoke again').*

I asked her next if she had ever classified herself as having a 'problem' associated with her use of alcohol. She affirmed this, and dated it, again, to October of last year. She stated:

- *It was a lot. In that same time frame. When I lived in Washington, I started drinking with Justin[11]. And I stopped explaining it, and then it became very regular. He drank every single night. And I, more or less, did, probably with him[12]. When I got down here, and after he broke up with me, I started drinking very heavily. I would say it was a lot up until June of 2021. I wouldn't drink every night, but I would be drunk*

---

[11] Her former romantic partner.
[12] My sense of this: Ms. Connelly would have been extremely hard pressed to set a 'no drinking' boundary with her paramour; indeed, she may have found this impossible.

*on weekends. I tried not to drink on Sundays. Or, if I would go a few days I'd be like, 'wow, it's been three days.' I'd be like, 'that's pretty good, but I'm not happy,' so I would drink again.*

I asked Ms. Connelly if her use of alcohol was associated with other 'bad decisions.' She leapt at this:

- *Yes! Very much. Um. I would either, um, somebody who I barely know, I would go out. And there's definitely a lot of people that I don't remember having sex with. But I did wake up at their place, and just leave.* [Did anyone take advantage of you sexually when you were intoxicated?]: *I don't know, but I'd consider that somewhat consensual because I was also there. And [was] getting drunk before anything happened, purposely[13].* [Was your use of alcohol or marijuana associated with the crime itself?]: *I don't know. I was extremely high the week of, and often drinking. But I wasn't intoxicated when it was happening. I was just agreeing to it.*

We have in the above acute abuse of both marijuana and alcohol, precipitated, it appears, by a 'death of hope[14]' experience, associated with the end of a romantic relationship. Ms. Connelly denied use of any other substance.

*Relationship, Sexual History & Pattern of Sexual Interest*

The defendant described her sexual orientation to me as 'straight,' and denied the existence of same-gendered sexual activity. She told me that she finds adult males between the ages of 25 and 35 attractive, and denied an ethnic or racial preference in partner. She told me of first masturbating at 15, and described the activity as only 'somewhat pleasurable' (she reported masturbating to fantasy only – she denied pornography use), and reported that this was not and is not a frequent activity.

I asked her of the existence of adverse sexual events in her history. She told me of her partner's aggression toward her, as well as of sexual 'flings' with others, which caused guilt and self-denigration. In regard to the first issue: Ms. Connelly told me of Justin's intense use of alcohol, and of a period of time in which she 'didn't remember him not being drunk.' She described him as an 'angry drunk,' and told me of coercive sexual experiences at his hands:

- [Would he act aggressively towards you when drunk?]: *He would, yeah. He would get very sexually aggressive. Like, if he wanted to have sex, he would just start tearing at my clothes. That kind of upset me, because it ruined a couple shirts.* [The two of you would have sex?]: *Yes.* [Against your will?]: *Well, I made it okay, because I didn't want him to be angry.* [How many times did he force himself on you?]: *Um. A lot. But again, I was consensual of him. Like, anything he wanted, I did.* [Bondage?]: *Maybe once or twice. But not often.* [He hit you?]: *Yes.* [Where?]: *My face.* [During sex?]: *Yes.* [Did he slap you?]: *Yeah.* [Did that hurt you?]: *Sometimes, yeah.* [Was there verbal abuse during sex?]: *He would sometimes be*

---

[13] Ms. Connelly may simply be incapable of externalizing guilt onto (even guilty) others. In her mind, she is complicit, and bad.
[14] My phrase pertaining to the etiology of masochistic defenses.

*verbal. But not very often.* [He would denigrate you?]: *Yes.* [What would he say?]: *It would be more possessive. Just like, 'you're mine.' <u>Which I was. That is what I believed</u>[15].*

To put the relationship in context: Ms. Connelly met Justin in August of 2018, at a 'church convention,' in Illinois. The two began to date, and the defendant followed her lover to Washington, in June of 2019. She thought the relationship was 'great,' and cited outdoor activities, such as hiking, as a mutual passion – 'he was basically everything to me,' she told me.

Things began to sour in early 2020; the defendant told me that Justin frequently became 'annoyed and just unhappy with' her. She stated:

- *It was everything. Every small thing. I really felt often during the relationship that I could never do anything right. Or I was never enough. Or what I did was never enough[16].*

Justin disparaged her profession, repeatedly, which confused her. She continued:

- *I was feeling accused, [and] I was being told it wasn't enough. It always confused me, because I was paying for my own apartment; I was 20, 21, and doing fine. I didn't feel like enough, because I did want to make him happy.*

Justin would frequently tell the defendant that he was unhappy, and bored, inside the relationship. Ms. Connelly tried to 'get a reason why,' to no avail: 'I never felt like I was given one.' We had the following exchange, in regard to Justin's decision to end the relationship, and the effect this had:

- *JR: Were you crushed?*

- *SC: Yeah. Well, I was extremely said, because this was someone who I felt, like, I gave him as much as I could…and I loved him very deeply. And I felt like I could be safe around him. Or, like, this is someone who I trusted beyond anybody else. We have a very deep connection, I thought. So, just to leave without an explanation, I didn't feel like there was any closure to that. I really felt like everything I had done in the past two years kind of meant nothing.*

- *JR: Your mood plummeted?*

- *SC: Yeah*

---

[15] Emphasis my own.
[16] She was unable to view her partner's behavior as pathological, due to that she was looking through the prism of masochism.

- *JR: You drank and smoked more?*

- *SC: Right*

- *JR: You began to have sex with anonymous partners?*

- *SC: Right*

- *JR: You felt as if you had failed*

- *SC: I don't know if failure is the right word. I just thought – I just felt worthless. Because, if what I gave was – I thought it was enough – and it wasn't, <u>then I wasn't worth anything</u> [17].*

In October of 2020 Ms. Connelly's relationship ended. She was bereft. In January of 2021 she committed the instant offense.

***Examination Results***

*Mental Status Exam*

The 'my thoughts' section of the interview protocol reads:

- *Modest*
- *Honest*
- *Intelligent*
- *Religious*
- *Naïve in worldly matters*
- *Utterly masochistic*

There is additionally a 'framework' section of the interview, in which I make notes to myself on the salient variables of a specific case. This reads:

- *Relatively okay when not in a relationship*
- *When in a relationship, grim beliefs, of service and sacrifice, get activated, and become the controlling narrative. Inside of this she suffers, cannot demarcate poor treatment of her, and returns for more punishment*

---

[17] Emphasis my own.

- *She is only semi-conscious of this*

A word on the last bullet above: At the termination of the interview I asked Ms. Connelly if she was desirous of feedback; she was. I took time to explain the intrapsychic conflict – the major etiological variable – in this case. I told her that she was very unlikely to commit a new crime at some future point, but that it *was* likely that she would wrestle with guilt and self-condemnation and the felt sense that she deserved to suffer inside romantic relationships. Her response: She seemed to buy-in only halfway. She was polite and respectful, but did not appear to be overly concerned in regard to my findings[18]; it was as if the feedback was not potent enough to penetrate the neurosis.

Ms. Connelly was oriented in all spheres (person, place, time, event), and she was polite and respectful throughout our time together. She appeared to make an effort to answer my questions, and she took offense at none. Her affect was calm, as her mood seemed to be (although I am convinced that she is massively distressed – 'terrified' to use her word – as to the resolution of her case, she was well organized, and showed little of her distress overtly).

Her thought process was clear, logical and organized, and she did not require questions to be repeated.  The volume of her speech was normal and there were no evident deficits in either her short or long-term memory. There was no evidence of any sort of delusional or hallucinatory material.  Finally, although she affirmed suicidal ideation as mentioned in the above, she denied any intent to harm anyone else.

### Childhood Adversity

Research consistently links ten adverse childhood experiences (ACEs) with adult risky behaviors, mortality, and negative physical and mental health outcomes. These ten experiences include: Emotional, physical or sexual abuse, emotional or physical neglect, and five forms of dysfunction in the childhood home, including substance abuse, mental illness, an incarcerated family member, witness to domestic violence, and parental separation/divorce or death. A 'dose-dependent' relationship has been established, in regard to the number of ACEs a person endures and the magnitude and number of adult 'problems' from which he suffers. To use just one example, high scorers on the ACE questionnaire were found to be at dramatically higher risk for the compulsive use of illicit substances in adulthood. Compared with subjects who scored 0 on the questionnaire, subjects who scored 6 (i.e. endorsed six negative events) were *46 times* more likely to report intravenous drug use in adulthood[19] . The magnitude of such relationships is rarely seen in social science research.

Ms. Connelly reported the existence of one negative event: the existence of a depressed or mentally ill household member. Her 'score' is thus lower than the average score, of 4, of adult (male) subjects who received treatment at my forensic outpatient clinic (N=155)[20].

---

[18] Perhaps she was simply pleased to learn her risk level.
[19] Felitti, V.J. (2003). [Origins of addiction: Evidence from a study of stressful childhood experiences]. [Article in German]. *Prax Kinderpsychol Kinderpsychiatr, 52*(8): 547-549.
[20] Reavis, J.A, Looman, J., Franco, K., & Rojas, B. (2013). Adverse Childhood Experiences and adult criminality: How long must we live before we possess our own lives? *The Permanente Journal, 17*(2), 44-48.

*Intelligence*

Ms. Connelly's intellectual performance was measured by Shipley-2, a brief measure of cognitive functioning and impairment. The assessment encompasses two areas of skill – Crystallized Ability, or knowledge that has been gained as a result of experience, and Fluid Ability, or the ability to use logic and other skills to learn and acquire new information. A subject's score is compared relative to a nationally representative development sample (N=2826). The defendant's scores:

| Shipley-2 | Vocabulary (crystallized) | Block Patterns (fluid) | Composite IQ | Impairment Index |
|---|---|---|---|---|
| Standard Score | 113 | 109 | 115 | 106 |
| Percentile Rank | 81 | 73 | 84 | |
| Interpretive Category | Above Average | Above Average[21] | Above Average | Within Normal Limits |

The defendant achieves a composite IQ score of 115 on Shipley, placing her in the Above Average range of intelligence. There is, as well, no indication of impaired cognitive functioning in this case. These are good prognostic indicators, as it comes to any attempt Ms. Connelly might make to increase her insight into her psychology by a course of therapy.

*Personality*

The Millon Multiaxial Clinical Inventory—Third Edition (MCMI-III) is a 175 item self-report instrument designed to diagnose personality disorders and major psychiatric syndromes in adult patients who are being evaluated for or receiving mental health services.  It is the second most used personality assessment instrument in both civil and criminal court cases[22], and, in a review article on its validity, was termed a 'uniquely useful instrument' for forensic applications[23].

Ms. Connelly produced a valid profile, with one caveat: The narrative below is indicative of moderate to severe, long-term psychopathology. The defendant was administered the assessment at the apex of her distress. Simply put: She was in crisis. While the major substrates below appear to mesh well with my clinical impressions, my sense of things is to think that during periods of less stress, although the dynamics remain the same, their magnitude is less intense than is reflected in the excerpts below. This notion is corroborated, at least in part, by Ms. Connelly's level of achievement; she has no previous criminal history, and until quite recently does not appear to have suffered from any Substance-Related Disorder. Her high school interpersonal and academic functioning was excellent (by her

[21] Low, Well Below Average, Below Average, Average, Above Average, Well Above Average, Superior.
[22] Craig, R.J. (2008). Millon Clinical Multiaxial Inventory—III. In R.P. Archer & S.R. Watson (Eds.), *Personality Assessment* (pp. 133-165).  New York, NY:  Routledge/Taylor & Francis Group.
[23] Dyer, F.J. (2008).  Using the Millon inventories in forensic psychology. In T. Millon & C. Bloom (Eds.), *The Millon Inventories:  A Practitioner's Guide to Personality Clinical Assessment* (2nd ed.) (pp. 177-195). New York, NY:  Guilford Press.

17

report), and she is a graduate of a two-year college. And finally (again by her report), her professional achievement, in a male-dominated industry, can probably be described, at a minimum, as 'good.' The reader is urged to bear this in mind as we continue.

Excerpts from MCMI interpretive report:

- *The...profile of this woman is suggestive of marked dependency needs, anxious seeking of reassurance from others, and her melancholic fear of separation from those who provide support.*

- *Although she is usually able to function on a satisfactory basis, she may experience periods of marked emotional, cognitive, or behavioral dysfunction.*

- *Significant relationships appear to have become increasingly insecure and unreliable. This has resulted in increased moodiness, prolonged periods of futility and dejection, episodes of obstructive anger, and the seeking of situations in which she may act out as a martyr[24].*

- *She is mostly seen as submissive and cooperative.*

- *Self-defeating habits and an attitude that she deserves to suffer may exasperate and eventually alienate those on whom she depends. When threatened by separation and disapproval, she may express guilt and self-condemnation in the hope of regaining support, reassurance, and sympathy.*

- *The self-demeaning comments and feelings of inferiority that mark this woman's major depression are part of her overall and enduring characterological structure, a set of chronic self-defeating attitudes and depressive emotions that are intrinsic to her psychological makeup.*

- *Feelings of emptiness and recurrent thoughts of death and suicide are accompanied by expressions of low self-esteem, preoccupations with failures and physical unattractiveness, and assertions of guilt and unworthiness. She's likely to assert that she deserves anguish and abuse. Such self-debasement is consonant with her self-image, as is her tolerance and perpetuation of relationships that foster and aggravate her misery.*

- *She is likely to turn to alcohol to facilitate psychological needs that are difficult for her to achieve otherwise. Alcohol may moderate her social anxieties and fears, enhance her self-confidence, and enable her to relate easily to others. It also serves– briefly– to bolster her depleted feelings of self-esteem and well-being.*

---

[24] What better way than by arrest?

- *[Use of other substances] are primarily employed to moderate her psychic pain, helping her to overcome her interpersonal fears and anxieties and to provide a respite from her travails. Also likely is their facilitation of fantasies that replace the loneliness and anguish that characterize her daily life.*

Quite a painful intrapsychic world. The environmental variable that allowed the behavioral manifestation of the neurosis is found in the termination of her romantic relationship. Her self-abasement and willingness to suffer reached pathological levels, she became suicidal, and accepted a very bad offer, from an adult male work peer.

Turning now to a consideration of personality formulations that have been empirically linked to social deviance:

*Antisocial Personality Disorder & Psychopathic Personality*

A Personality Disorder, according to Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)[25], 'is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment' (p. 645). Antisocial Personality Disorder (ASPD) is characterized by a 'pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood and or early adolescence and continues into adulthood' (p. 659). Diagnostic criteria for ASPD, as defined by the DSM-5, follow, as does an examination of the application of each to the present case:

1. *Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest:* This criterion does not match in this case.
2. *Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure:* No evidence in support of this.
3. *Impulsivity, or failure to plan ahead:* Perhaps a 1 here on a 3-point ordinal scale, where 0 = a poor match, 1 = maybe or a partial match, and 2 = a good match, to capture Mr. Connelly's recent (and intense) use of substances (as well as, perhaps the lack of thought that allowed her to say 'yes' to a very bad proposition).
4. *Irritability and aggressiveness, as indicated by repeated physical fights or assaults:* No evidence.
5. *Reckless disregard for the safety of others:* No evidence.
6. *Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations:* A seemingly good work history, despite Ms. Connelly's young age.
7. *Lack of remorse, as indicated by being indifferent to or rationalizing of having hurt, mistreated, or stolen from another:* Certainly, the defendant does not rationalize her conduct. She is painfully aware of what she has done, and the illegality of her actions.

---

[25] American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed.).

Discrete diagnosis of Antisocial Personality Disorder is made contingent upon the presence of three of the above criteria. Ms. Connelly does not suffer from ASPD.

*Psychopathic Personality*

In comparison to nonpsychopathic criminal offenders and as measured by the Psychopathy Checklist-Revised, psychopathic criminals have been found to be more likely to engage in violent criminal behavior and property crimes, theft, armed robbery, assault and forcible seizure, use of a weapon, and attempted escape and escape from prison. They have been found to be more predatory, or instrumental, in their behavioral patterns, to evidence arousal to sadistic sexual and *nonsexual* themes, to be three times more likely to fail on conditional release, and to be difficult to treat psychologically, generally and with specific regard to decreasing risk. Psychopathy is the prototype for the criminal personality, and a severe variant of antisocial personality.

Ms. Connelly's total score of 0 on the Psychopathy Checklist-2nd Ed. (PCL-R 2nd Ed.) places her in the Very Low range of the construct, and at the .1st percentile, in comparison to a North American female offender sample (N=1218). More than 99 percent of the subjects from the samples upon which the instrument was 'normed' achieved higher scores than the defendant's. In this case, the problems lie outside the realm of either a discretely antisocial mindset or high degree of psychopathy.

**DSM-5 Diagnostic Profile**

Major Depressive Disorder, Recurrent, Moderate

Other Specified Personality Disorder (Masochistic) with Dependent Personality Traits

Alcohol Use Disorder, Moderate

Cannabis Use Disorder, Mild

**RISK APPRAISAL**

*Actuarial Risk Appraisal*

*Risk for General Recidivism*

*Level of Service/Case Management Inventory (LS/CMI)*

The LS/CMI is a 'fourth generation' risk assessment instrument, utilizing a total of 43 static and dynamic items, and a 'risk/need/responsivity' theoretical perspective. The instrument comprises, among other items, the 'big eight' factors most predictive of reoffense – Antisocial Cognitions, Antisocial Associates, Previous Antisocial Behavior, Antisocial Personality Pattern, and problems in the areas of: Family, School or Work, Leisure, and Substance Abuse.

Its predecessor, the LSI-R, was found by meta-analytic research to predict violent recidivism moderately well, equal to the Psychopathy Checklist-Revised (PCL-R)[26] in its capacity to forecast recidivistic violence.

Ms. Connelly was found to be in the Low Risk/Need category on LS/CMI[27]. Her score, of 7, is as high or higher than 24.9 percent of the normative sample of adult female community offenders in North America. Individuals from that sample scoring in his risk category were found to recidivate at a rate of 8 percent over a one-year time period. The defendant's risk level in each category is demarcated in the below.



Risk Level (Score)

***Summary & Recommendations to Manage Risk in the Community***

Serena Connelly agreed to do a favor for a friend, a decision which led to her arrest in the instant matter; although she denies that she was aware of the specifics of what would occur, she accepts responsibility for her behavior, and is remorseful.

Ms. Connelly is neither an antisocial personality nor a psychopath. She has suffered acutely with the controls on her use of both marijuana and alcohol. Her tendency toward self-punishment, and a tolerance for pain – what I have termed masochism – 'mixed poorly' with a significant event in her life, which is to say her then-boyfriend's decision to terminate the relationship. In the aftermath of this she became unduly self-blaming, and was not able to apportion any amount of responsibility (for what appears to have been abusive treatment) onto her partner. She experienced a 'death of hope' event, after which her use of substances intensified in frequency and magnitude, and she began to

---

[26] Campbell, M. A., French, S., & Gendreau, P. (2009). The prediction of violence in adult offenders: A meta-analytic comparison of instruments and methods of assessment. *Criminal Justice and Behavior*, *36*(6), 567–590.
[27] Very Low, Low, Medium, High, Very High.

engage in sexual activity with anonymous (or little known) partners.

She was approached, in her telling, by an adult male work acquaintance, and accepted his offer of 'easy money.' She traveled to Mexico from San Diego, and allowed an adult friend of her acquaintance to borrow her vehicle for a brief period. Upon her attempt to re-enter the United States, she was stopped, searched, and apprehended, with over 70 pounds of the stimulant narcotic 'crystal' methamphetamine hidden inside her vehicle. In the aftermath of her arrest she is accepting of wrongdoing, self-abasing, and nearly dazed by events.

Why did Ms. Connelly, a hyper-moral, deeply religious, rigid, self-denying woman commit this crime? Because her intrapsychic world evidenced a kind of tropism toward self-blame and self-punishment. Because she did not 'handle well' the relationship dysfunction and acrimony with her boyfriend. Because she was convinced that she had failed, and was unable to extricate herself from what was almost certainly intense and inexorable self-denigration. Because she likely felt that she had to manifest her self-hatred and 'badness' in behavioral form, this eventuated in sexual promiscuity, substance abuse and felonious criminal activity.

For readers that are uninterested (or disbelieving) of the effect of one's psychology on social deviance, my conclusions might appear fanciful. An adult woman commits a crime so as to give behavioral form to her self-hatred? Indeed. I can only state in my defense that 25 years of working with offenders has taught me the importance of attending to the specific psychodynamics of an offender. Without an understanding of these, Ms. Connelly's offense behavior would be, in fact, impossible to parse.

Finally, the defendant is at Low risk for criminal recidivism. She should work in individual psychotherapy, to increase her insight into the nature of her ailment; should work with a psychiatrist, as a means of decreasing the intensity of a depressive disorder; should undergo urine drug screen testing, to assist in her efforts at sobriety; and attend 12-step meetings, to receive social support from others who has struggled with the controls on their use of substances.

Thank you for allowing me to evaluate this woman.  Should you desire further information, please do not hesitate to contact me.

Sincerely,

James A. Reavis, Psy.D.
Director, Intrapsychic

22